UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RAUL TRUJILLO JUAREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO.  3:05-CV-1946-M |
| | § | |
| JO ANNE B.  BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of 28 U.S.C. § 636(b) and an order of the District Court in implementation thereof, the subject cause has previously been referred to the United States Magistrate Judge.  The findings, conclusions, and recommendations of the Magistrate Judge, as evidenced by his signature thereto, are as follows:

Procedural History:  On May 16, 2003, Plaintiff filed an application for Disability Insurance Benefits alleging disability which began on April 13, 2001, due to a back disorder and diabetes. (Administrative Record 114-17, 119 [Hereinafter Tr.].)

The Administrative Law Judge ("ALJ") conducted a hearing on January 31, 2005.  (Tr. 17-36.)  On February 24, 2005, the ALJ denied Plaintiff's request for benefits, finding that he was not disabled because he retained the residual functional capacity to return to his past relevant work as a baker.  (Tr.  10-16.)

Plaintiff timely requested a review of the ALJ's decision by the Appeals Council, and on June 10, 2005, the Appeals Council denied the request.  (Tr.  3-5.)  Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review.  *See Masterson v.*

*Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

Plaintiff filed his federal complaint on September 30, 2005. Defendant filed her answer on December 5, 2005. On March 7, 2006, Plaintiff filed his brief and on May 5, 2006, Defendant filed her brief.

Standard of Review–Social Security Claims: When reviewing an ALJ's decision to deny benefits, the scope of judicial review is limited to a determination of whether: (1) the ALJ's decision is supported by substantial evidence and (2) the proper legal standard was applied. *Castillo v. Barnhart*, 325 F.3d 550, 551 (5th Cir. 2003) (citing *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). In determining whether substantial evidence exists, the court reviews the entire record, but does not reweigh the evidence, retry the issues, or substitute its own judgment. *Villa*, 895 F.2d at 1022 (quoting *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988)). Where the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971)).

Discussion:

To prevail on a claim for Disability Insurance Benefits, a claimant bears the burden of establishing that he or she is disabled, which is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

2

last for a continuous period of not less than twelve months." 20 C.F.R. § 404.1505.  Substantial gainful activity is defined as "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  § 404.1510.  Where a claimant applies for benefits, the claimant must prove the existence of a disabling impairment between the claimant's alleged onset date and the date last insured.  *See Moss v. Apfel*, No. 98-20215, 1999 WL 130146, at *1 (5th Cir.  Feb. 12, 1999) (citing § 404.320(b)(2)).

 The ALJ uses a sequential five-step inquiry to determine whether a claimant is disabled.  *See* § 404.1520.  Under the first four steps, a claimant has the burden of proving that his disability prevents him from performing his past relevant work, but under the fifth step, the burden shifts to the Commissioner to prove that there is other substantial gainful activity that the claimant can perform.  *See*, *e.g.*, *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 (1987); *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

 In this case, the ALJ proceeded to step four and determined that Mr. Juarez retained the functional capacity to perform his past relevant work as a baker. (Tr. 15-16.)  She therefore denied Plaintiff's request for benefits.  (Tr. 16.)

 The documents contained in the administrative record reflect the following chronology of medical care:

 Dr. Phillip Rodriguez, a chiropractor, referred Plaintiff to Dr. John D. Fisk, M.D., for x-ray examination on April 23, 2001.  Dr. Fisk reported disc spondylosis[1] at the T11-12, T12-L1,

---

[1] "Spondylosis (spinal osteoarthritis) is a degenerative disorder that may cause loss of normal spinal structure and function."  Spine Universe, Spondylosis, http://www.spineuniverse.com/displayarticle.php/article1440.html (last visited Dec. 21, 2006).

L4-5 and L5-S1 levels,[2] and bilateral facet osteoarthrosis at the L4-5 and L5-S1 levels. (Tr. 228.) On April 27, 2001, Plaintiff was seen by Dr. Robert Peinert, Jr., M.D, for a consultation. (Tr. 229-30.) He reported suffering a sudden onset of acute low back pain after picking up boxes at work and stated that he continued to experience back pain as well as radiating pain and numbness in his leg. (Tr. 229.) A physical examination revealed a moderate restriction in range of motion of the spine to the left and mild restriction to the right, significant restriction during the forward flexion movement, minimal pain during the straight leg raising test, no presence of Waddell signs, and palpitation along the paraspinal muscles elicited virtually no pain. (Tr. 229.) Dr. Peinert's initial diagnosis was acute posttraumatic lumbar facet syndrome that did not require surgery. (Tr. 230.) He prescribed Vioxx for inflamation and Ultram for pain relief. (Tr. 230.)

On June 28, 2001, Dr. Rodriguez referred Mr. Juarez to Dr. Paul Vaughan, M.D., an orthopedic surgeon, for an initial examination and consultation. (Tr. 226.) Plaintiff reported suffering severe back pain which ranged from a 6 to a 9 on a scale of 1 through 10 but stated that the pain did not interfere with his sleep. (Tr. 226.) Dr. Vaughan noted that Plaintiff had initially responded well to conservative treatment measures but that his symptoms had reoccurred. (Tr. 226.) Dr. Vaughan's examination revealed a positive Lasegue's sign on the right and left at 90 degrees, normal strength and sensation in the lower extremities with equal reflexes and a full flexion with only 30% of normal extension. (Tr. 226.) An MRI showed a large 15mm herniated disc at the L4-L5 level and an 8mm herniated disc at the L5-S1 level with evidence of some disc

---

[2] The letter L followed by a number identifies a specific vertebra in the lumbar spine, while the letter T followed by a specific number identifies a specific vertebra in the thoracic spine. North American Spine Society, Glossary of Spinal Terms, http://www.spine.org/fsp/glossary.cfm (last accessed Dec. 16, 2006). Two vertebrae locations separated by a hyphen identify the location of a disc. *Id.*

desiccation at both levels. (Tr. 226.)  Dr. Vaughan advised Plaintiff that he was a good candidate for surgery to remove fragments of disc, which would provide pain relief and help avoid longer term risks. (Tr. 227.)

A lumbar myelogram performed on July 20, 2001, revealed degenerative loss of disc height in the L5-S1 discs, bilateral flattening of both S1 nerve roots and mild ventral flattening on the thecal sac at the L4-5 level without amputation of the L5 nerve roots. (Tr. 224.)  A CT scan taken on the same day revealed a 2mm bulging disc, disc height narrowing, mild posterior osteophyte formation, and bilateral neural foraminal spurring and stenosis at the L5-S1 level, as well as another bulging disc at the L4-L5 level and moderate degenerative facet disease at the L3-4 level. (Tr. 225.)  Dr. Vaughan reviewed the CT scan and myelogram on August 9, 2001, and concluded that Plaintiff did not need surgery because there was no encroachment or nerve entrapment but noted that Mr. Juarez might benefit from epidural steroidal facet injections. (Tr. 223.)

On August 24, 2001, Plaintiff had neuromuscular junction testing of the lower extremity which was indicative of abnormal neuropathic changes consistent with nerve root dysfunction at the L4 and S1 levels. (Tr. 220.)  A somatosensory evoked potential test revealed abnormal neuropathic changes below the level of the cauda equina on the left and above the level bilaterally. (Tr. 221.)  Additionally, a nerve conduction study was indicative of abnormal motor and sensory neuropathic changes consistent with a bilateral tibial and right sural neuropathy with evidence of an interruption in the nerve pathway on the right. (Tr. 222.)

On October 25, 2001, Mr. Juarez had the first of a three-injection series of epidural steroidal facet injections. (Tr. 218-19.)

The record contains a three-hour functional capacity evaluation performed by Dr. Rodriguez on June 24, 2002. (Tr. 209-17.) Dr. Rodriguez observed that Plaintiff had a reduced range of motion, swelling, and tenderness in the lumbar region. (Tr. 209.) He classified Plaintiff as being able to perform medium exertion work with the occasional ability to lift 25 pounds, a frequent ability to lift 12 pounds, and the ability to sit and stand for 15 minutes. (Tr. 210, 212.) He also stated that Plaintiff appeared to need psychological treatment to help him manage his pain. (Tr. 210.)

On March 26, 2002, one of Dr. Vaughan's physician assistants saw Plaintiff and noted that he had a 90 degree straight leg test bilaterally with a positive Lasegue's sign and 5/5 lower extremity strength bilaterally. (Tr. 208.)

In a follow-up report on April 26, 2002, Dr. Vaughan noted that Plaintiff continued to complain of severe low back pain and left radicular leg pain to the knee. (Tr. 207.) He stated that Plaintiff had failed conservative treatment including physical therapy, injections and chiropractic adjustments and opined that it was medically reasonable and necessary for Mr. Juarez to undergo a two-level discogram at the L4-L5 and L5-S1 levels. (Tr. 207.)

Plaintiff was next seen by Dr. Vaughan on September 17, 2002. (Tr. 192.) He continued to complain of severe mechanical back pain and intermittent radicular pain in the left leg. (Tr. 192.) He reported that epidural steroidal injections gave him only temporary pain relief. (Tr. 192.) An MRI revealed marked degenerative disc disease at the L4-L5 level with a very large central disc herniation and marked degenerative disc disease at the L5-S1 level with disc space narrowing and a very large central disc herniation. (Tr. 192.) On this occasion Dr. Vaughan recommended alternative surgical procedures for Mr. Juarez to consider. (Tr. 192.)

At the request of the Texas Workers Compensation Commission ("TWCC"), Plaintiff was seen by Dr. Uma Gullapalli, M.D., on September 23, 2002, for a maximum medical improvement ("MMI")/impairment evaluation. (Tr. 162-66.) Plaintiff reported that he hurt his back on April 13, 2001, when he slipped and fell on a wet and icy floor. (Tr. 162.) He stated that he took Vioxx, Ultram and Tylenol for pain. (Tr. 163.) He also reported a history of diabetes, hypertension and high cholesterol. (Tr. 163.) Dr. Gullapalli noted that Plaintiff's functional capacity had been evaluated three times previously and that each time he was found to have the capacity for medium exertion work. (Tr. 162-63.) Upon physical examination, Dr. Gullapalli noted that his gait was normal, and that he had decreased sensation in his left leg, decreased strength in the left dorsi flexors, and decreased left ankle reflex. (Tr. 163.) Testing indicating that his L-S flexion and extension were limited to ½ of full range of motion and the straight leg test was painful at 60 to 70 degrees on the left side. (Tr. 163.) She opined that Mr. Juarez had reached maximum medical improvement and that he had the capacity to perform work at the medium exertional level. (Tr. 164.) She gave him a whole body impairment rating of 10 percent. (Tr. 164.)

Plaintiff was again seen by Dr. Vaughan on April 1, 2003. (Tr. 191.) He continued to complain of severe mechanical back pain which had increased slightly and intermittent radicular pain in the left leg. (Tr. 191.) The doctor recommended that Mr. Juarez have surgery with which Plaintiff agreed. (Tr. 191.) He opined that Plaintiff should remain off work pending the surgical procedure. (Tr. 191.) Plaintiff was approved for surgery on approximately April 22, 2003, and was scheduled to undergo the procedure four weeks from the approval date. (Tr. 190.)

Dr. Alfred Zevallos, M.D., evaluated Plaintiff on May 5, 2003, for pre-operative

7

clearance. (Tr. 168-69.) He found that Mr. Juarez could tolerate the surgery from a cardiorespiratory standpoint without difficulty and counseled him to continue his diabetes and cholesterol medications. (Tr. 169.)

Dr. Dennis Pacl, M.D., a state medical consultant, reviewed Plaintiff's medical records and completed a Functional Capacity Assessment on July 3, 2003. (Tr. 180-88.) He determined that Plaintiff had the ability to: occasionally lift 50 pounds, frequently lift 25 pounds, and stand/walk/sit six hours in an eight hour work day. (Tr. 181.) He also found Mr. Juarez to have unlimited push/pull capabilities and the ability to frequently climb, balance and kneel, and occasionally stoop, crouch and crawl. (Tr. 182.) He also noted that Plaintiff "opted not to undergo" surgery to repair his herniated discs and that he was not wholly credible in regard to his allegations of a disabling condition. (Tr. 181, 185.)

Approximately nine months after Dr. Pacl's assessment, at Mr. Juarez's attorney's request, Dr. Rodriguez completed a low back residual functional capacity questionnaire and a medical assessment of physical ability to do work-related activities relative to Plaintiff's physical capabilities on April 28, 2004. (Tr. 231-34.) He stated that Plaintiff suffered muscle spasms, pain and numbness in his extremities, difficulty walking, muscle weakness, depression, a reduced range of motion and swelling. (Tr. 231.) He noted that Plaintiff was a candidate for surgery but that it was postponed until his diabetes was under control. (Tr. 231.) He described Plaintiff's impairment as moderate to severe lower back pain which radiated down his left leg and that his impairment had not improved since the date of his original injury. (Tr. 231, 234.)

Dr. Rodriguez opined that Plaintiff's symptoms were frequently severe enough to interfere with his attention and concentration and that his medications could cause drowsiness.

8

(Tr. 232.) He determined that Plaintiff could walk less than one city block without experiencing severe pain. (Tr. 232.) He also found that Plaintiff could sit and stand for 15 minutes intervals and could sit, stand and walk for a total of 2 hours during an 8 hour work day. (Tr. 232.) During the workday, Dr. Rodriguez noted that Plaintiff would need to be able to walk around, shift positions, and take unscheduled breaks approximately every 15 minutes. (Tr. 232-33.) He opined that Plaintiff was never able to bend, squat, crawl or climb and could occasionally reach. (Tr. 235.) Regarding Mr. Juarez's use of his arms, he opined that Plaintive could lift less than 10 pounds and had significant limitations in doing repetitive reaching, handling or fingering. (Tr. 233-34.) He also determined that Plaintiff was likely to be absent from work more than three times per month. (Tr. 234.)

Plaintiff testified on his own behalf at the administrative hearing held on January 31, 2005. (Tr. 21-32.) He testified that he completed high school and one year of technical school while living in Mexico and that he immigrated to the United States in 1972. (Tr. 21-22.) He stated that he is unable to read or write in English and started working as a baker in 1979. (Tr. 24.) He continuously worked as a baker until April of 2001 when he hurt his back. (Tr. 24.) He testified that he was scheduled to have back surgery at one time but that Dr. Vaughan cancelled it because his diabetes was out of control. (Tr. 27.)[3] He testified that his diabetes remains out of control. (Tr. 29.)

Plaintiff testified that he experiences intermittent numbness in his left leg from the hip to the knee that will occur when he walks for more than 30-45 minutes. (Tr. 29.) He estimated that he could stand or walk for less than one hour in an eight hour work day, could sit for

---

[3] Nothing in the record corroborates Plaintiff's statement that Dr. Vaughan cancelled the surgical procedure.

approximately one hour and could lift less than 10 pounds without pain. (Tr. 28-30.) While working as a baker, he lifted 40 pound bags of flour on a daily basis. (Tr. 28.) He also testified that he must lay down on him stomach at least two or three times per day due to back pain. (Tr. 31.)

On a typical day he wakes up, takes his medication, watches TV and tries to engage in some form of exercise, usually walking, and sometimes cooks and does some light cleaning. (Tr. 30.) He testified that he takes Tylenol for his pain as well as medication for his diabetes and high cholesterol and that his medications sometimes make him dizzy and make his stomach burn. (Tr. 26, 31.)

Russell Bowden testified as the vocational expert ("VE") at the hearing. (Tr. 33-35.) He stated that plaintiff's past relevant work as a baker is classified as skilled work with a medium exertional requirement. (Tr. 33.) Mr. Bowden testified that the skills Plaintiff acquired were transferable to several light-exertion jobs including a pantry goods maker and a deli operator, but that his skills were not transferable to any sedentary positions. (Tr. 33-34.) When asked by the ALJ to consider whether a person of the same age, education and past relevant work as Plaintiff could perform his past relevant work if he was limited to medium-exertion work, with the non-exertional limitations of occasional crouching, crawling, and stooping and frequent climbing, balancing and kneeling, he responded that such a person would be able to perform Plaintiff's past relevant work. (Tr. 34.) He stated that if the aforementioned person could only work in a light-exertion position or in a less-than-sedentary position, he would not be able to perform Plaintiff's past relevant work due to the lifting requirements of a baker. (Tr. 34-35.)

Plaintiff posits six points of error in his motion for summary judgment, four of which

10

relate to the ALJ's evaluation of the medical evidence as it relates to Plaintiff's treating physicians and two of which pertain to the ALJ's assessment of Plaintiff's residual functional capacity and ability to return to his past relevant work.

Plaintiff argues that the ALJ improperly assessed and rejected the medical opinions of Plaintiff's treating physicians Drs. Vaughan and Rodriguez without re-contacting them to obtain clarification of the medical evidence. He also asserts that the ALJ substituted her own lay opinion for that of Plaintiff's treating physicians. Under the regulations, the medical opinion of an examining source is generally given more weight than the opinion of a nonexamining source. § 404.1527(d)(1). Where the examining source is a "treating source," any opinion regarding the nature and severity of a claimant's impairment should be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, subject to certain exceptions. § 404.1527(d)(2). One instance in which an ALJ may decline to give the opinion controlling weight is when the treating physician's opinion is contradicted by competing first-hand medical evidence. *See Walker v. Barnhart*, 158 Fed. Appx. 534, 535, 2005 WL 3340251, at *1 (5th Cir. 2005) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)). In such an instance, the ALJ need not comply with § 404.1527(d) which requires an ALJ to set forth her rationale for giving less weight to the treating physician's opinion. *Walker*, 2005 WL 334951, at *1.

The ALJ rejected the opinion regarding the nature of severity of Plaintiff's impairment set forth in the residual capacity questionnaire and the medical assessment report completed by Dr. Rodriguez in 2004 because it was not based on a recent functional capacity assessment of Mr. Juarez and because it conflicted with Dr. Rodriguez's previous assessment of Plaintiff. (Tr. 13.)

11

In both of these reports, Dr. Rodriguez paints an extremely grim picture of Plaintiff's ability to function, including opining that Plaintiff would miss work more than three times per month due to his impairment, that he would need to take unscheduled breaks (lasting for 15-20 minutes) at work every 15 minutes during an eight hour work day, that he could only use his hands/fingers/arms repetitively for two to four hours per day with breaks every 15 minutes, and that Plaintiff's level of impairment had remained constant since the time he initially injured his back. (Tr. 231-36.)

However, Dr. Rodriguez cites little evidence in the record to support these opinions. In the questionnaire, Dr. Rodriguez does not refer to any clinical findings or laboratory test results which support his opinion but merely indicates that Dr. Vaughan, Plaintiff's orthopedic surgeon, recommended that Plaintiff undergo back surgery. (Tr. 231.) In the medical assessment form, he cites an MRI which indicated that Plaintiff had marked degenerative disc disease at the L4-L5 level and two large herniated discs. (Tr. 236.)

Much of the evidence in the record conflicts with Dr. Rodriguez's opinion that Mr. Juarez's back impairment continues to cause him to experience wide-ranging physical limitations. For instance, the record contains no evidence that Plaintiff suffered any impairment in his hands, fingers or arms. Likewise, although Dr. Rodriguez stated that Plaintiff suffered moderate to severe back pain, he testified at the administrative hearing that he only takes Tylenol for his back pain, even though he initially was prescribed the stronger painkiller Ultram. Mr. Juarez also testified at the hearing that he regularly engages in exercise, including walking for 30-45 minutes.

Moreover, the assessments given by Dr. Rodriguez in April 2004 conflict with his prior functional capacity evaluation ("FCE") made on January 24, 2002. (Tr. 209-17); *see also* (Tr.

12

162-66) (Dr. Gullapalli's evaluation completed on September 23, 2002). Therefore, due to the lack of support for many of Dr. Rodriguez's conclusions and the competing first-hand medical evidence, the ALJ did not err by rejecting the opinion of Dr. Rodriguez. *See* § 404.1527(d)(2); s*ee also Walker*, 158 Fed. Appx. at 535, 2005 WL 3340251, at *1.[4]

The ALJ also rejected Dr. Vaughan's opinion, contained in an April 1, 2003, report that Plaintiff required surgical intervention to relieve his back pain. The ALJ's stated bases for rejecting Dr. Vaughan's surgery recommendation were that Dr. Vaughan had once interpreted a CT scan of Plaintiff's spine as showing no encroachment and that he had never previously recommended surgery for Mr. Juarez. However, unlike the unsupported opinions rendered by Dr. Rodriguez in his 2004 reports, Dr. Vaughan's surgical recommendation appears to be well-founded. A sequential review of Dr. Vaughan's treatment notes indicates that he recommended surgery only after other conservative measures, such as epidural steroidal injections, had failed. As such, the ALJ erred by relying on alleged inconsistencies among isolated notations in the record to reject Dr. Vaughan's recommendation of surgery.

Although the ALJ erroneously rejected Dr. Vaughan's opinion that surgery was recommended, Plaintiff has failed to show that he was prejudiced by this error. *See Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000); *see also Bean v. Barnhart*, 454 F. Supp. 2d 616,

---

[4] Defendant argues that Dr. Rodriguez's opinion is not entitled to controlling weight because, as a chiropractor, Dr. Rodriguez is not considered an "acceptable medical source." Because the undersigned finds that Dr. Rodriguez's opinion is inconsistent with other credible medical evidence in the record, Defendant's argument need not be addressed. However, the undersigned notes that the Social Security Agency recently stated in a published ruling that "[g]iving more weight to the opinion from a medical source who is not an 'acceptable medical source' than to the opinion from a treating source does not conflict with the treating source rules in 20 C.F.R 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p." Social Security Ruling 06-03P, at *5 (S.S.A. Aug. 9, 2006).

621-622 (E.D. Tex. 2006). The chronology of treatment by Dr. Vaughan as contained in the record reflects that Mr. Juarez was seen over a period of twenty-one months due to reoccurring back and leg pain. When more conservative treatment regimens failed to resolve the pain issues, the doctor recommended surgical intervention for which pre-operative clearance was given in May 2003. Despite the presence of pain for which Plaintiff was taking Tylenol on the date of the administrative hearing, Dr. Vaughan never opined or suggested that these symptoms impaired his ability to perform his prior job requirements, and there is no showing that Plaintiff could or would have adduced evidence from Dr. Vaughan which would have altered the ALJ's decision that he was not disabled.[5]

Plaintiff also argues that the ALJ erred in failing to make findings on the functional demands of Plaintiff's past relevant work in accordance with Social Security Ruling 82-62 (S.S.R. 1982). The evidence presented at the administrative hearing included that of the vocational expert, Russell Bowden. (Tr. 33-35.) Based upon Mr. Juarez's past work history and the exertional demands of his past employment, the VE categorized Plaintiff's past employment as meeting the description of the Dictionary of Occupational Titles (D.O.T.) 313-338.1010, SVP of 6, to wit: skilled labor with medium exertional requirements, which were transferable to other light food preparation occupations. Mr. Bowden further testified that none of the demands of

---

[5] Mr. Juarez also complains of the ALJ's failure to obtain additional information and records (Point of Error IV). While an ALJ has a heightened duty to insure the record is fully developed when an applicant is proceeding *pro se*, *see Kane v. Heckler*, 731 F. 2d 1216, 1219-20 (5th Cir. 1984), in this case, counsel appeared on his behalf and did not suggest that any further records other than those received at the hearing were necessary. Counsel obtained Dr. Rodriguez's residual capacity questionnaire and medical assessment report dated April 28, 2004. "When an applicant is represented by counsel an [ALJ] is entitled to assume that the applicant is making his strongest case for benefits." *Glen v. Sec'y of Health & Human Serv.*, 814 F.2d 387, 391 (7th Cir. 1987). Finally, he has made no showing that other records of Dr. Vaughan might have altered the decision made.

Plaintiff's former jobs conflicted with the information in the D.O.T.

The ALJ found the VE's testimony to be reliable and that it supported the determination that Mr. Juarez could perform his past relevant work. (Tr. 15.) In describing the role and efficacy of a VE, the Fifth Circuit observed:

> The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job.

*Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986).

The ALJ also posited a hypothetical question, which incorporated the limitations which she found Plaintiff to have–i.e. medium exertion, with frequent climbing, balancing and kneeling and occasional stooping, crawling and crouching, (Tr. 15), to the VE who opined that these limitations would not preclude performance of past relevant work. (Tr. 34.) Although the ALJ did not list a function-by-function analysis of his former job demands, her decision, based in part on the VE's testimony, shows that she gave appropriate consideration to the demands of Plaintiff's former employment. Even if more were required under Social Security Ruling 82-62, Mr. Juarez has failed to show any prejudice as a result of the ALJ's failure to expressly articulate each and every physical and mental demand which his prior relevant work entailed.

Finally, Plaintiff argues that the ALJ erred in failing to fully discuss Mr. Juarez' RFC in conformity with Social Security Ruling 96-8p (S.S.R. 1996). The Ruling requires an ALJ to consider the following seven physical functions when determining a claimant's RFC: sitting, standing, walking, lifting, carrying, pushing and pulling. SSR 96-8p, at *5; *see also Myers v. Apfel*, 238 F.3d 617, 620-21 (5th Cir. 2001). In this case, the ALJ did not discuss Plaintiff's

ability to sit, lift, carry, push or pull. (Tr. 15.) However, an ALJ's failure to perform a function-by-function assessment before expressing residual functional capacity in terms of exertional levels of work has been excused by the Fifth Circuit where it is evident that the ALJ based his RFC decision, as least in part, on medical reports which contain a function-by-function evaluation of a claimant's exertional capabilities. *See Beck v. Barnhart*, No. 06-50421, 2006 WL 3059955, *5 (5th Cir. Oct. 27, 2006) (finding an ALJ's RFC analysis to comport with *Myers* where it was based in part on the medical reports which contained "a general evaluation of [the claimant's] mobility and a function-by-function analysis of the impact of her impairments on her ability to perform various tasks"). In her decision, the ALJ noted Dr. Rodriguez's functional capacity assessment of January 24, 2002, (Tr. 212), in determining that Plaintiff could perform medium exertion, (Tr. 12), which was part of the medical record which Dr. Pacl, the state agency consultant, reviewed in determining that Plaintiff was not precluded from medium exertion work (Tr. 181, Part A). The ALJ expressly concurred in Dr. Pacl's opinion. (Tr. 13.) As part of his assessment, Dr. Rodriguez evaluated Plaintiff's ability to sit, stand, walk, lift, and carry. (Tr. 212, 217. However, his assessment did not address Plaintiff's ability to push and pull.[6] Aside from Dr. Rodriguez's rejected April 28, 2004, report, there is nothing in the record, including Plaintiff's own testimony at the administrative hearing, which suggested that he had any difficulty in "push-pull" functions. Therefore, Plaintiff cannot demonstrate any prejudicial error in the ALJ's failure to expressly address each of the seven strength demands in her decision.

---

[6] Dr. Rodriguez later evaluated all seven functions in his April 28, 2004, report, but as stated, *supra*, the ALJ rejected this report. On the other hand, Dr. Pacl in his July 3, 2003, assessment found no limitation on Plaintiff's "push and/or pull" functioning. (Tr. 181, Part A.5).

**RECOMMENDATION:**

For the forgoing reasons, it is recommended that the District Court enter its order AFFIRMING the decision of the Commissioner and DISMISSING this action with prejudice  A copy of this recommendation shall be transmitted to counsel for the parties.

Signed this 9th day of January, 2007.

_____
Wm. F. Sanderson Jr.
United States Magistrate Judge

NOTICE

In the event that you wish to object to this recommendation, you are hereby notified that you must file your written objections within ten (10) days after being served with a copy of this recommendation.  Pursuant to *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996)(*en banc*), a party's failure to file written objections to these proposed findings of fact and conclusions of law within such ten (10) day period may bar a *de novo* determination by the district judge of any finding of fact and conclusion of law and shall bar such party, except upon grounds of plain error, from attacking on appeal the unobjected to proposed findings of fact and conclusions of law accepted by the district court.